80 A.3d 1045

**Millicent SUMPTER**

v.

**Sean SUMPTER.**

No. 120, Sept. Term, 2011.

Court of Appeals of Maryland.

Dec. 9, 2013.

Stephen J. Cullen (Kelly A. Powers, Miles & Stockbridge, Baltimore, MD), on brief, for Petitioner.

Julia Doyle Bernhardt, Asst. Atty. Gen. (Douglas F. Gansler) amicus, for Respondent.

Douglas F. Gansler, Esquire, Attorney General of Maryland, Julia Doyle Bernhardt, Esquire, Asst. Atty. Gen., Baltimore, MD, for Amicus Curiae brief of Attorney General of Maryland.

Argued before BARBERA, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, McDONALD, WATTS, JJ.

ADKINS, J.

In this case we examine the application of a local court policy that sets limits on litigants' access to court-ordered investigatory reports in child custody cases. Here, Millicent Sumpter ("Mother") challenges the Circuit Court for Baltimore City's application of its "Policy Regarding Distribution of Court Ordered Evaluative Reports" ("the Policy") and its subsequent award of sole legal and physical custody of her children to Sean Sumpter ("Father"). The Court of Special Appeals, in an unreported opinion, affirmed the Circuit Court. We granted Mother's petition for writ of certiorari to consider the following question:

> Did the Court of Special Appeals err in refusing to vacate and remand the case to the circuit court when the parties and the best interest attorney were not provided a copy of the custody investigation report in violation of constitutional due process?

In our initial consideration of this appeal ("*Sumpter I* "), we declined to reach the merits of Mother's petition and remanded the case "for supplementation of the record as to the full contours of [the Policy]." *Sumpter v. Sumpter*, 427 Md. 668, 670, 50 A.3d 1098, 1099 (2012). With the written expression of the Policy in hand, we now reach the merits.

## FACTS AND LEGAL PROCEEDINGS [1]

Father filed a complaint in the Circuit Court for Baltimore City for absolute divorce from Mother on March 24, 2010. Father also sought sole physical and legal custody of the couple's two children. Before the merits hearing on Father's petition for divorce, the court ordered that the Adoption and Custody Unit ("ACU") for the Circuit Court complete a custody investigation report ("the Report").

The Report summarizes interviews that ACU staff conducted with the parties, the parties' relatives and partners, and the children. The Report also describes the parties' personal, criminal, health, education, housing, child protective services, and employment histories. This information is presented as findings in the Report's first 17 pages. The findings are supplemented with 17 attachments. These attachments span 147 pages and consist of various records upon which the ACU based its findings, including: Maryland Department of Public Safety and Correctional Services records for Mother, Father, and Father's fiancée; school records for the children; mental health records for the children and Mother; peace orders awarded to Father's mother and Father's fiancée against Mother; peace orders awarded to Mother against Father and Father's fiancée; a guilty plea by Mother in a matter in the Superior Court of Liberty County, Georgia; a Jacksonville, Florida police report about the death of Mother's cousin; and an order of the Circuit Court for Baltimore City returning one of Mother's other children to her custody after the child had been in the "Child in Need of Assistance" program. The Report does not make a recommendation concerning custody of the children.

The Report was due on November 1, 2010,[2] in time for a scheduled pre-trial conference, but the ACU did not file the

---

1. Because the details of the factual background and procedural history 1 were addressed in *Sumpter I*, 427 Md. 668, 50 A.3d 1098 (2012), we only briefly recount them here.

2. On July 12, 2010, the Circuit Court issued an Order For Referral To Adoption and Custody Unit, which directed that a custody investigation

Report with the court until December 3, 2010. That day, the ACU sent counsel for both parties a letter indicating that the Report was complete and could be reviewed at the Family Division Clerk's Office. Counsel for Mother received this notification on December 6, 2010, and visited the Family Division Clerk's Office at 2:30 p.m. that day.

We digress a little at this point. According to the record, the Policy was promulgated on June 25, 2004, as evidenced by a Memorandum from the Judge In Charge of the Family Division to other judges, masters, and "All Members of the Family Law Bar."[3] Counsel's access to the Report in the present case was limited by the Policy, which states the following concerning litigants' access to the Report:

**Review of Reports**

- Attorneys will be allowed to view all of the sections of a report in the office of the Clerk of the Court (room 109). They will not be allowed to carry the report out of the Clerk's office and will not be allowed to copy the report.

- Pro Se litigants will be allowed to view the Recommendation section and the section of the report evaluating them in the office of the Clerk of the Court (room 109). They will not be allowed to carry the report out of the Clerk's office and will not be able to copy the report. They will not be allowed access to

---

be performed by the ACU, and its written report provided to the judge "no later than November 1, 2010 for the pretrial conference scheduled on November 12, 2010." A copy of the order was sent to the ACU. On the same day, the court issued a Scheduling Order, setting the Pre–Trial Conference for November 12, 2010, and the Trial on the Merits for December 13, 2010.

3. The Policy was promulgated in writing before the trial judge here was appointed to the Circuit Court. The record does not indicate whether the trial judge received a copy of the written 2004 Policy, or its 2007 amendment, although obviously he had some awareness of a restriction on disclosure of the Report. The record is also silent as to whether counsel for Petitioner was included in the "Family Law Bar," who were recipients of the Policy.

sections of the report that evaluate the other party or any minor children.

- Counsel for children will be allowed to view all sections of a report in the Office of the Clerk of the Court (room 109). They will not be allowed to carry the report out of the Clerk's office and will not be able to copy the report.
- Attorneys may obtain copies of a report with an Order of the Court.
- Pro Se litigants may be allowed to view all sections of a report with an Order of the Court.[4]

Mother's counsel studied the 161–page Report and took notes for ninety minutes until the Family Division's Clerk's office closed to the public for the day.[5] Mother's counsel were not able to return to the clerk's office before the merits hearing, and did not see the Report again until that time.

The two-day merits hearing began on December 13, 2010. Mother's counsel moved *in limine* to exclude the Report from evidence, or, in the alternative, to receive a copy of the Report. The trial court denied these motions, erroneously stating that the Policy "prevent[ed] copies from being out even

---

**4.** In a memorandum dated March 6, 2007, the Policy was amended to accord pro se litigants the same access to custody investigation reports as represented litigants. The amendment declared, in pertinent part:

[T]he review section of [the Policy] is amended to indicate that attorneys, pro se litigants and counsel for children will be permitted to take notes of the contents of evaluative reports but are not able to remove the report from the Clerk's Office or to copy the report, except by order of court.
All other terms of [the Policy] remain in full force and effect.

**5.** In *Sumpter I* we stated, based on representations of Mother's counsel at argument, that under the Policy, "[c]ounsel of record may make only hand-written notes of the contents of the report, yet are forbidden from copying verbatim significant passages." 427 Md. at 670, 50 A.3d at 1099–1100 *(footnote omitted)*. The Policy itself does not explicitly prohibit making verbatim notes of the Report. The Policy states that counsel may take notes from the Report, but may not copy it. Exactly how staff in the Family Division Clerk's Office apply this provision of the Policy is unclear from the record. Here, counsel "were [ ... ] permitted to make [their] own personal notes from the report[.]"

in the control of counsel[.]"[6] The trial court did allow counsel access to the Report during breaks and for the purpose of examining witnesses. To accomplish this, the court's copy of the Report had to be shared amongst counsel, the mechanics of which brought some measure of absurdity to the proceedings.

The trial court granted Father's petition for divorce and awarded him sole legal and physical custody of the children. Mother appealed to the Court of Special Appeals, arguing that the Policy violated her due process rights. Specifically, Mother asserted that the Policy prevented her and her counsel from receiving a copy of the Report, and provided them insufficient time to review its contents. Mother claims that this inhibited her ability to prepare for trial, frustrated her ability to retain an expert, and ultimately, prevented her from challenging the Report as she would any other piece of evidence. In short, Mother argued that the Policy afforded her inadequate procedural protection, given her fundamental liberty interest in the care and custody of her children that was at stake in the trial. The Court of Special Appeals affirmed the Circuit Court.

Mother then petitioned this Court for a writ of certiorari, which we granted. Neither Father nor the children's best-interest attorney opposed the petition, filed briefs or appeared at oral argument. *Sumpter I*, 427 Md. 668, 672, 50 A.3d 1098, 1100 (2012). In an opinion filed August 21, 2012, we declined to reach the merits of Mother's appeal for two reasons. *Id.* First, the record did not contain the Policy or sufficient evidence to "elucidate the full contours of the policy or rule and how it is applied." *Id.* Second, Mother's appeal had been unopposed, and as a result, one-sided. *Id.* We remanded the case for supplementation of the record and invited the Office of the Attorney General to participate, as *amicus curiae*, in

---

**6.** The following statement from the trial court demonstrates its misapprehension of the Policy: "With respect to having a copy of the report, I will not deviate from the Court's practice in dealing with matters as sensitive as these reports of preventing them-preventing copies from being out even in the control of counsel[.]" In fact, the Policy explicitly states that "Attorneys may obtain copies of a report with an Order of the Court." Significantly, the State concedes that "the trial judge was

**82**

light of the absence of Respondent.[7] *Sumpter I,* 427 Md. at 672, 50 A.3d at 1101.

## DISCUSSION

 Discretionary trial court matters are "much better decided by the trial judges than by appellate courts, and the decisions of such judges should only be disturbed where it is apparent that some serious error or abuse of discretion or autocratic action has occurred." *Northwestern Nat'l Ins. Co. v. Samuel R. Rosoff, Ltd.,* 195 Md. 421, 436, 73 A.2d 461, 467 (1950).

 Even when we find an abuse of discretion, this Court follows the maxim that "appellate courts of this State will not reverse a lower court judgment for harmless error: the complaining party must show *prejudice* as well as *error.*" *See Harris v. David S. Harris, P.A.,* 310 Md. 310, 319, 529 A.2d 356, 360 (1987) (italics in original). Prejudice means an "error that influenced the outcome of the case." *Id.*

 Before considering the trial court's actions in this case, we must put those actions in context. When Mother's counsel reviewed the Report to prepare for trial, this review was circumscribed by the Policy, as enforced by the Clerk's office for the Family Division. When Mother's request for a copy of the Report at trial was denied, the trial court followed suit. Indeed, the entire trial was informed by a judicial fiat issued long before Father's divorce petition was filed. Thus, in some sense, we cannot review the actions at the trial court without also considering the Policy itself.

 Undoubtedly, our court system vests trial judges with a great deal of discretion and responsibility. In *City of Bowie v. MIE Props., Inc.,* we stated:

> As a general proposition, trial judges have the widest discretion in the conduct of trials, and the exercise of that discretion should not be disturbed on appeal in the absence

---

incorrect in his apparent belief that the circuit court's policy prohibited each attorney from having his or her own copy during the trial[.]"

7. We appreciate the willingness of the Office of the Attorney General to assume this role, at our request.

of clear abuse. Thus, a trial judge maintains considerable latitude in controlling the conduct of a trial subject only to an abuse of discretion standard.

398 Md. 657, 684, 922 A.2d 509, 525 (2007) (quotations omitted). Recognizing the unique position of a trial judge, we have declared:

> "[w]e place[ ] the responsibility on the trial judge to weigh and balance the rights, interests, and reasons of the parties ..." and "the trial judge, on the scene, will have a perception and understanding of the legal environment in which the case is temporarily mired [,]" and "[t]herefore, [the trial judge] [i]s vested with the discretion to be exercised consistent with the spirit of the law while subserving the ends of justice and fairness to the parties."

*St. Joseph Med. Ctr., Inc. v. Turnbull,* 432 Md. 259, 275, 68 A.3d 823, 832–33 (2013) (quoting *Langrall, Muir & Noppinger v. Gladding,* 282 Md. 397, 400–01, 384 A.2d 737, 739 (1978)) (alterations in original). We further observed that "once assigned to preside over a trial, it is generally within the province of a trial judge to make discretionary decisions that affect the rights and interests of the litigants." *Id.*

The Policy, through its enforcement by the clerk's office and misapplication by the trial court, frustrated Mother's full ability to examine the Report and challenge its content. A child custody investigation report's main content is a series of individual investigations of the parents and relatives, and interviews with both children. These reports typically contain substantial hearsay and hearsay-within-hearsay.[8] These reports also include the investigators' subjective impressions on matters like the parties' homes, their relationship with the children, and the parties' relationship with each other. The Report's attachments include items like Mother's mental

---

8. As the Court of Special Appeals noted in *Denningham v. Denningham,* 49 Md.App. 328, 335, 431 A.2d 755, 759 (1981), custody investigation reports "consist largely of hearsay declarations ... which may or may not have a reasonable basis[.]"

health records, the children's school records, and various court documents.[9] Likely, this is fertile ground for content that is biased, subjective, and contestable.

Under the Policy, Mother's counsel had limited time to examine the Report and investigate its findings—a process that requires interviewing witnesses and evaluating documents.[10] Without a reference copy of the Report, Mother's counsel was not able to present the Report to an expert.[11] Indeed, without a copy of the Report, Mother may not have been able to retain an expert at all.[12] Consequently, Mother was unable to prepare a vigorous rebuttal of the Report.

9. We recognize the legitimate need to protect the Report's confidential information. The Policy is laudable, at least, in its pursuit of this goal.

10. *See* Linda D. Elrod, *Child Custody Practice and Procedure*, §§ 10:11–10:12 (2013) ("The report is relevant evidence subject to discovery. The lawyers should be able to review the report, prepare for cross-examination and possibly rebuttal testimony.... In reviewing the report, the lawyer will check the qualifications of the investigator, the depth of the investigation, and the techniques used.... The attorney can also try to find out the investigator's reputation and credibility in the field.... The attorney should be alert to the biases of the investigator.... If psychological testing was done, by whom, under what conditions and what were the results? The attorney should obtain a copy of the actual reports, rather than rely on the investigator's summary.") (footnotes omitted).

11. *See* American Psychological Association, *Guidelines for Custody Evaluations in Family Law Proceedings*, 65:9 American Psychologist 863, 866 (December 2010) ("Psychologists strive to employ multiple methods of data gathering. Multiple methods of data gathering enhance the reliability and validity of psychologists' eventual conclusions, opinions, and recommendations.... Psychologists may seek corroboration of information gathered from third parties and are encouraged to document the bases of their eventual conclusion.").

12. *See* American Psychological Association, *Speciality Guidelines for Forensic Psychology* (2011), available at http://www.apa.org/practice/guidelines/forensicpsychology.aspx# (last accessed October 18, 2013) ("**1.02 Impartiality and Fairness** ... Forensic practitioners recognize the adversarial nature of the legal system and strive to treat all participants and weigh **all data**, opinions, and rival hypotheses impartially.") (emphasis added). Any expert working without the Report would not be weighing all the data. The inability to fulfill this ethical precept may have posed a significant barrier to Mother even retaining an expert.

By disabling Mother from fully challenging the Report, the trial judge deprived the court of one of the core benefits of the adversarial system: the progression towards truth through the presentation of counter-evidence.[13] And, by so gravely impairing Mother's interest in a fair trial, application of the Policy surpassed, in this instance, mere court administration.

This Court has defined abuse of discretion in numerous ways, but has always enunciated a high threshold. *Wilson–X v. Dep't of Human Resources*, 403 Md. 667, 677, 944 A.2d 509, 515 (2008); *see also Wilson v. John Crane, Inc.*, 385 Md. 185, 199, 867 A.2d 1077, 1084 (2005) ("an abuse of discretion should only be found in the extraordinary, exceptional, or most egregious case."). In *North v. North*, then Chief Judge of the Court of Special Appeals, Judge Wilner, characterized the abuse of discretion landscape as follows:

> "Abuse of discretion" is one of those very general, amor-phous terms that appellate courts use and apply with great frequency but which they have defined in many different ways. It has been said to occur "where no reasonable person would take the view adopted by the [trial] court," or when the court acts "without reference to any guiding rules or principles."
>
> . . .
>
> The decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.

102 Md.App. 1, 13–14, 648 A.2d 1025, 1031–32 (1994) (altera-tions in original) (internal citations omitted).

---

**13.** *See* Robert G. Johnston & Sara Lufrano, *The Adversary System As A Means of Seeking Truth and Justice*, 35 J. Marshall L.Rev. 147 (2002) ("The adversary system is based on the assumption that the truth of a controversy will best be arrived at by granting the competing parties, with the help of an advocate, an opportunity to fight as hard as possible.") (citing Edward F. Barrett, *The Adversary System and the Ethics of Advocacy*, 37 Notre Dame L.Rev. 479, 480 (1962)).

In *Gunning v. State*, this Court considered a trial judge who applied a policy denying requested eyewitness identification instructions based on his personal opinion that such instructions were inappropriate. 347 Md. 332, 351, 701 A.2d 374, 383 (1997). This Court held that the trial court abused its discretion by applying a hard and fast rule to a decision that required the court to exercise its discretion. *Id.* We emphasized that the requested instructions "should have at least been given careful consideration in the instant cases, and arbitrarily rejecting them as always inappropriate was an abuse of discretion." *Gunning*, 347 Md. at 353–54, 701 A.2d at 384.

A judge presiding over a particular case may not blindly apply an administrative policy (or through misapprehension of what the policy required or allowed, misapply it) without considering the particular circumstances at hand. As we said in a recent case,

> Despite being vested with this discretion, the hearing judge failed to appreciate or exercise her discretion, in favor of an "unyielding adherence to [a] predetermined position," and an improper deference to her understanding of the Administrative Judge's views. In this case, the record is clear that the hearing judge commenced the hearing with no intention of entertaining seriously the parties' arguments (no matter what they were), but rather indicated that she had decided prior to the hearing to defer to the Administrative Judge's opinion.... When a circuit court is vested with discretion, such predispositions are inappropriate and constitute an abuse of discretion.

*101 Geneva LLC v. Wynn*, 435 Md. 233, 77 A.3d 1064, 1070 (2013) (citations omitted).

That is what happened here. The trial court misapplied a policy issued by the Judge in Charge of the Family Division for the Circuit Court for Baltimore City. Although we do not know the exact scope of this role, we assume that the Judge in Charge has authority to make certain administrative decisions. But the Policy does much more than impact the administration

of the courts. By any standard, the Policy surpasses mere court administration and affects the rights of individual litigants.

Mother's access and ability to receive a copy of the Report is properly a matter of judicial discretion, as the Policy recognizes. *See Goodman v. Commercial Credit Corp.*, 364 Md. 483, 491, 773 A.2d 526, 531 (2001) ("when there is no hard and fast rule governing the situation, in arriving at a decision, the trial judge must exercise his or her judicial discretion"); *see also* 48A C.J.S. Judges § 151 ("Judicial discretion is the right or power to choose between the doing and not doing of a thing which cannot be demanded as an absolute right of the party asking that it be done."). The trial court abused its discretion by invoking what it incorrectly thought the Policy required, to govern its ruling. When the court denied Mother's motion based on this misapprehension, it applied a misconceived, hard and fast rule to a matter that required the exercise of its discretion.

We now address the question of prejudice. As indicated, prejudice occurs when an error affects the outcome of a case. *See Harris*, 310 Md. at 319, 529 A.2d at 360. The harmless error test does not have precise standards, but is instead based on the facts of each case. *See Flores v. Bell*, 398 Md. 27, 33, 919 A.2d 716, 720 (2007); *see also State Deposit Ins. Fund Corp. v. Billman*, 321 Md. 3, 17, 580 A.2d 1044, 1051 (1990) ("In determining whether [the error] . . . prejudicially affected the outcome of a civil case, the appellate court balances 'the probability of prejudice from the face of the extraneous matter in relation to the circumstances of the particular case[.]' ") (citations omitted). To determine whether prejudice occurred, courts look "to the degree to which the conduct of the trial has violated basic concepts of fair play." *Barksdale v. Wilkowsky*, 419 Md. 649, 658, 20 A.3d 765, 770 (2011) (citations omitted). Generally, the complaining party must show that prejudice was probable, not just possible. *Barksdale*, 419 Md. at 662, 20 A.3d at 773.

The test for what constitutes prejudice varies based on the "context of the case—civil or criminal—and by the type of error alleged." *Barksdale,* 419 Md. at 658, 20 A.3d at 770. For particularly acute errors, this Court will employ a presumption of prejudice. *Barksdale,* 419 Md. at 659, 20 A.3d at 771 ("In civil cases, Maryland courts have varied the tests based on the relative gravity of the error. For the more egregious civil errors, Maryland employs a presumption of prejudice.").[14]

In cases involving egregious civil errors, the presumption of prejudice enables this Court to meet "the need to provide for hearty review of trial errors." *See Barksdale,* 419 Md. at 660, 20 A.3d at 771 (citing *Harris,* 310 Md. 310, 319–20, 529 A.2d 356, 360–361 (1987)). In *Harris,* the lower court erroneously disqualified one of the party's attorneys. *Harris,* 310 Md. at 319, 529 A.2d at 361. We "relied on a presumption of prejudice due to the practical impossibility of proving prejudice." *See Barksdale,* 419 Md. at 660, 20 A.3d at 771 (citing *Harris,* 310 Md. at 320, 529 A.2d at 361). Had this Court not presumed prejudice, the disqualification would not be "subject to effective postjudgment review." *Harris,* 310 Md. at 320, 529 A.2d at 361.

Like the court in *Harris,* we are faced with the practical impossibility of determining whether Mother was prejudiced by the trial court's error. Here, the trial court's error so hamstrung the defense that every aspect of the trial

---

14. A presumption of prejudice emanates from the balancing act courts employ in determining prejudicial error. *See Kyle v. United States,* 297 F.2d 507, 514 (2d Cir.1961). In *Kyle,* the Second Circuit explained:

The reason why the showing of prejudice required to bring down the balance in favor of a new trial will vary from case to case is that the pans contain weights and counterweights other than the interest in a perfect trial. Sometimes only a small showing of prejudice, or none, is demanded because that interest is reinforced by the necessity that "The administration of justice must not only be above reproach, it must also [be] beyond the suspicion of reproach," and by the teaching of experience that mere admonitions are insufficient to prevent repetition of abuse.

*Kyle,* 297 F.2d at 514 (citations omitted).

was affected.[15] This error so infected the trial proceedings [16] that it can only be characterized as egregious. Indeed, we cannot know how that infection might have contaminated the outcome of the case. Because determining prejudice is practically impossible, we will presume it in this case.[17]

The State argues that Mother disclaimed prejudice by declining to move for a continuance. We are unpersuaded. Given the court's misapprehension of the Policy, a continuance would not have resulted in Mother receiving a copy of the Report. Without a copy of the Report, Mother's counsel would be limited to investigating its contents from the information captured in their personal notes. This would pose a practical hindrance to the investigation of the Report's findings. Moreover, Mother would still have difficulty retaining an expert. In this case, a continuance would not have been a cure-all. That is why Mother's counsel declined to move for a continuance, stating, "I do not need a continuance, Your Honor. I need an actual copy of the report."

Even if Mother had sought a continuance upon first discovering the belated filing of the Report, obstacles remained. First, a continuance is not easily obtained. Under the "Postponement Policy for the Circuit Court for Baltimore City," a request for modification of a pretrial conference date or trial date "shall be made through a written motion for modification filed within 15 days of the initial order setting a date for pretrial conference and/or trial." Thereafter, motions for continuance are subject to the following policy:

---

**15.** One need only consider the absurd procedure that occurred during the examination of witnesses, where one copy of the Report was shared among three separate counsel. Forcing litigants to assume the role of dogs fighting over a bone does not comport with this Court's notion of fair play, particularly when the "bone" in question is a critical piece of evidence.

**16.** We described these trial ailments *supra* at 83–85, 80 A.3d at 1050–52.

**17.** We emphasize that a presumption of prejudice is reserved for the most egregious civil errors. *See supra* at 87–89, 80 A.3d at 1053–54. Moreover, we underscore that the harmless error test always requires a fact-intensive, case-by-case inquiry. *See supra* at 87–88, 80 A.3d at 1053.

Thereafter, except for exigent circumstances, the schedule may be modified only upon filing with the clerk a *written* Motion for Modification setting forth a showing of good cause for why the schedule cannot reasonably be met despite the diligence of the party seeking modification.

Modification requests in cases on the domestic docket made for *exigent circumstances* * will be heard daily at 4:00 p.m. in Room 108, Courthouse East, on a walk in basis. Any party seeking a postponement must arrive in Room 108 **no later than 3:45 P.M.** and must ensure that all other parties and/or attorneys involved in the case are present for the postponement proceeding. The Court **WILL NOT** entertain a postponement request unless **ALL** involved parties are present.

* *"Exigent circumstances"* means an **unforeseen development** occurring *within 30 days* of the scheduled date which prevents compliance with the schedule.

Circuit Court for Baltimore City, *Family Docket–Postponement Policy,* available at http: //www.baltocts.state.md.us/ family/postponement.htm, (last accessed October 4, 2013).

As we read this policy, in any case where counsel need a continuance based on the Report, counsel will need to coordinate the schedules of all parties to schedule a hearing. Otherwise, such a postponement must, presumably, wait until the merits hearing. This coordination may be difficult, particularly in cases where the parties are confrontational, or there is a short time frame between the Report's issuance and the merits hearing.

Moreover, the State's argument demonstrates some misapprehension of the delicate nature of custody proceedings. When custody is disputed, children face instability. *See In re Adoption/Guardianship No. 95195062/CAD in Circuit Court for Baltimore City,* 116 Md.App. 443, 460–61, 696 A.2d 1102, 1110 (1997) ("We are mindful of the concerns of many children's advocates who are understandably critical of inordinate delays in resolution of these painful cases. Surely, these cases warrant swift and careful attention, because when a child's

status remains in 'limbo,' the child often suffers.") (footnote omitted). When custody is disputed, children face instability and risk, becoming objects in a custodial tug-of-war. *See Brown v. Brown*, 463 N.E.2d 310, 313 (Ind.Ct.App.1984) ("A prompt hearing is especially essential in a custody case where the parties are dueling for a child's affections and the longer a delay, the more chance one party has to influence the child."). In recognition of the maladies of delay in child access cases, Maryland issued Rule 8–207(a), providing expedited appeal for adoption, guardianship, child access, and child in need of assistance cases.[18] To accept a postponement may delay a trial for months. Such a delay is not desirable, and a litigant's reluctance to pursue this result is understandable.

Mother has strenuously argued that the trial court's erroneous application of the Policy violated her due process rights. Mother's interest in the care and custody of her children "is perhaps the oldest of the fundamental liberty interests recognized by [law]." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000). In other circumstances, we might inquire as to whether the Policy as stated affords parents constitutionally adequate procedural protections, given the interest at stake. *See, e.g., Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (setting forth a three-factor balancing test to determine the constitutional adequacy of procedural protections in cases infringing on individuals' fundamental liberty interest to parent). But this Court has long embraced the doctrine of constitutional avoidance. *See, e.g., State v. Raithel*, 285 Md. 478, 484, 404 A.2d

---

**18.** In adopting Md. Rule 8–207, the Reporter's Note cites correspondence from Alan M. Wilner, then Chief Judge, Court of Special Appeals, who stated that certain procedural delays in deciding appeals were "much too long, however, especially in the guardian and child custody/visitation cases, where time is particularly important." Maryland Register, Vol. 22, Issue 11, Friday, May 26, 1995, Reporter's Notes at 816. As Chairman of the Court of Appeals Standing Committee on Rules of Practice and Procedure, Judge Wilner also stated that the rule's "object is to reduce the time of the appellate process so that the children involved are not in limbo for an extended period of time." Minutes of January 6, 1995, at 47.

264, 267 (1979) ("[N]othing is better settled than the principle that courts should not decide constitutional issues unnecessarily."). In practice, this doctrine means that when a non-constitutional ground for deciding a case presents itself, we decide the case on that ground rather than the constitutional grounds. *See Allgood v. State*, 309 Md. 58, 82, 522 A.2d 917, 929 (1987).

Here, a non-constitutional ground presents itself, as the trial court erroneously applied its mistaken understanding of a rigid policy to a matter that required the sound exercise of its discretion. For this reason, we will not opine on the constitutional aspect of Mother's appeal.[19]

In conclusion, the trial court abused its discretion by applying the Policy to procedural matters that required the court to exercise its discretion. Because of the egregious error of not allowing Mother's counsel a copy of the Report and the practical impossibility of evaluating prejudice, we presume that the trial court's error prejudiced Mother. For these reasons, we reverse. As we do not wish to leave the matter of custody in a vacuum (and to avoid the temptation for either party to engage in self-help) until this issue can be brought before the Circuit Court on remand, we modify the custody order granting custody to Father, with visitation to Mother, to an interim *pendente lite* order, subject to further order of the Circuit Court on remand and after a new hearing on this

---

**19.** Although we refrain from commenting on the constitutionality of any matter until we are compelled to do so, we nevertheless recognize that the Policy raises the potential for constitutional concern. We can envision a policy that better balances the concern for safeguarding the confidentiality of information held by courts, and the interest in fundamentally fair trial procedure held by litigants. For instance, courts could use protective orders and their contempt powers to control parties, counsel, and experts by issuing appropriate sanctions. *See* Md. Rule 15–201 *et seq.* Alternatively, courts could require that parties, counsel, and experts sign a confidentiality agreement or non-disclosure covenant as a condition of receiving the Report. *See Sumpter I*, 427 Md. 668, 684–86, 50 A.3d 1098, 1108–1109 (recounting the practices of some other counties in Maryland). Great care should be taken in striking the appropriate balance. Thus, we refer this issue to the Rules Committee for its consideration and recommendation.

matter. *See Koffley v. Koffley,* 160 Md.App. 633, 641, 866 A.2d 161, 166 (2005); Md. Rule 8–604(a)(4) and (e).

JUDGMENT REVERSED; ORDER GRANTING CUS-TODY TO FATHER, WITH VISITATION TO MOTHER, MODIFIED TO AN INTERIM PENDENTE LITE OR-DER, SUBJECT TO REVISION BY THE CIRCUIT COURT ON REMAND; CASE REMANDED TO THE CIR-CUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY PETITIONER.

McDONALD and WATTS, JJ., concur and dissent.

Concurring and Dissenting Opinion by McDONALD, J., which WATTS, J., joins.

I agree with much, though not all, of the Majority opinion. In particular, I share the Majority's concerns regarding the written policy of the Circuit Court of Baltimore City on access to court-ordered custody investigation reports. It is possible that application of that policy could, in some instances, result in prejudice to a party. But I would not apply a "presumption of prejudice" in the circumstances of this case.

Mother's [1] counsel should be commended for shining a light on this important issue. As the Court of Special Appeals indicated 30 years ago,[2] a litigant in a custody case has a right to have access to the circuit court's custody investigation report. But there is apparently some confusion in the Circuit Court for Baltimore City concerning its policy on access to such reports, and there appear to be disparate practices in other jurisdictions. As Mother's counsel eloquently argued before us, this confusion may at times especially disadvantage

---

1. Millicent Sumpter is designated as "Petitioner" in some of the filings in this Court and as "Appellant" in others, perhaps because she skipped the intermediate appellate court in her second trip to this Court, see Maryland Rule 8–111(a)(1). I will follow the Majority's convention of referring to her simply as "Mother."

2. *Denningham v. Denningham,* 49 Md.App. 328, 431 A.2d 755 (1981) (Wilner, J.).

self-represented litigants. These efforts of counsel, who represent Mother *pro bono,* exemplify the best of the legal profession and hopefully will improve the quality of justice in our courts.

What to do about it in this case is another question. Our appreciation for counsel's service to the legal system does not mean that the decision of the Circuit Court concerning custody and visitation is unjust. The record before the Circuit Court provided an ample basis for the Circuit Court's decision concerning custody and visitation.[3] The relevant facts are summarized in the unreported opinion of the Court of Special Appeals and in this Court's prior decision. *See Sumpter v. Sumpter,* 427 Md. 668, 673–75, 50 A.3d 1098 (2012). These facts included, among other things, sexual abuse of the children while in Mother's custody, her enlistment (while she had custody of the children) of a convicted murderer to locate and assault a former boyfriend, and her contemporaneous convictions for assault and theft. After moving out of state and sending the children back to Maryland to live with her husband, Mother attempted to regain physical custody through deception and abduction. Unsurprisingly, the Circuit Court concluded that she had demonstrated "extremely poor judgment."

It is not at all clear that Mother suffered any prejudice from the Circuit Court's apparent misunderstanding of the access policy. Both of Mother's counsel were given advance access to the custody investigation report, which did not make a custody recommendation, for an hour and a half. Most of the material in the report consisted of records already available to Mother. Counsel were able to use the report at the hearing to cross-examine the author of the report. In the Circuit Court,

---

**3.** It received little attention in the recent briefing before us, perhaps because no attorney appeared on behalf of Father to defend that decision. The Attorney General was invited by this Court to appear as amicus curiae to defend the Circuit Court policy, not to advocate on behalf of Father (who had no greater access to the report than Mother), and properly did not address the merits of the custody and visitation decision.

Mother's counsel described the report as "entirely cumulative" of the testimony of the report's author. As the Court of Special Appeals noted, Mother's counsel has not argued that any of the attachments to the report contain anything that is "untrue, or misleading, or that . . . needed to be rebutted or supplemented." In the recent argument before us, Mother's counsel focused more on the disadvantage a self-represented litigant might experience under the Circuit Court's policy, rather than argue any specific prejudice to his client.

As the Majority opinion notes, before this Court reverses a decision, a complaining party must normally show prejudice— *i.e.,* an "error that influenced the outcome of the case." Majority op. at 82–83, 86–87, 80 A.3d at 1050, 1052–53. And the effect on the outcome must be "probable, not just possible." *Id.* at 87–88, 80 A.3d at 1053. The Majority opinion overcomes this standard by employing a "presumption of prejudice." Majority op. at 88–89, 80 A.3d at 1053–54.

As I understand it, the Majority would not apply a presumption of prejudice to every case governed by the Circuit Court's policy, but only to cases in which the particular judge misunderstood the option under the policy to provide a copy to counsel by court order. The "presumption of prejudice" that the Majority derives from the *Harris* case [4] is a burden-shifting presumption, not a conclusive presumption. Application of this presumption should not result in the automatic reversal of a custody and visitation decision. Thus, application of such a presumption does not require a different result or, in my view, eliminate the possibility that any error was harmless.[5]

---

**4.** *Harris v. David S. Harris, P.A.,* 310 Md. 310, 319–20, 529 A.2d 356 (1987).

**5.** It appears that, under the Majority's view, *Denningham* itself was wrongly decided. In that case, the intermediate appellate court held that, although the father had been denied *any* access to the report, its content was "basically cumulative" of other information available to the father and the failure to provide access was harmless error that did not affect the circuit court's decision to award custody to the mother. *Denningham,* 49 Md.App. at 338, 431 A.2d 755.

Mother requested that we reverse the Court of Special Appeals with direction to vacate the custody and visitation provisions of the Circuit Court's Judgment of Absolute Divorce. The Majority opinion reverses the decision of the Court of Special Appeals and remands for further proceedings consistent with its opinion, but maintains the current custody and visitation order pending further proceedings in the Circuit Court. Since the presumption underlying the reversal is not conclusive, it would seem that the Circuit Court has discretion to decide what, if any, further action to take in this case based on the entire record before it.[6] Thus, the Majority opinion should not be taken as a direction as to the award of custody in this case.

Finally, I agree with the Majority that this issue should be referred to the Rules Committee to consider the views of various interested parties and to craft a rule that provides a uniform system—or at least minimum standards—for making custody investigation reports available to litigants in these cases.[7] *See* Majority op. at 91–93 & n. 19, 80 A.3d at 1055–56 & n. 19.

Judge WATTS joins this opinion.

---

**6.** If the custody decision is reopened, it seems likely that a new report would be necessary as it is now more than three years since the report in question was created.

**7.** It is certainly difficult for us to fashion such guidelines in the narrow confines of a particular case. For example, while it is important, as Mother's counsel has argued, that self-represented litigants have access in some fashion to a custody investigation report, it may be necessary to establish some limitations or safeguards on such access. Emotions run high in these cases, which sometimes necessitates protective orders; the disciplinary tools available to the court to control misuse of information may be less effective in controlling the conduct of a lay person than of an attorney.