*A.A. v. Ab.D.*
No. 3499, Sept. Term, 2018
Opinion by Leahy, J.

**Family Law > Child Custody > Discovery Violations > Sanctions**

The best interests of the child standard is the leading consideration for the court in deciding whether to preclude a party from introducing evidence as a discovery sanction in a child custody case. Children have an indefeasible right to have their best interests fully considered. *See Flynn v. May*, 157 Md. App. 389, 410 (2004).

**Family Law > Child Custody > Discovery Violations > Sanctions**

Normally, we evaluate a trial courts' discovery sanction in a civil case through a well-defined lens—abuse of discretion. *Rodriguez v. Clarke*, 400 Md. 39, 57 (2007); *see also Das v. Das,* 133 Md. App. 1, 15 (2000) ("Abuse of discretion occurs 'where no reasonable person would take the view adopted by the [trial] court,' or when the court acts 'without reference to any guiding rules or principles.'" (quoting *North v. North*, 102 Md. App. 1, 13–14 (1994))). However, before we look through that lens in a child custody case, we must be satisfied that the court has applied the best interests of the child standard in its determination.

**Family Law > Child Custody > Discovery Violations > Sanctions**

In a child custody case, the court has an absolute and overriding obligation to conduct a thorough examination of all possible factors that impact the best interests of the child, as articulated in *Montgomery Cty. Dep't of Soc. Servs. v. Sanders*, 38 Md. App. 406, 420 (1977), and, with particular relevance to a consideration of joint custody, as articulated in *Taylor v. Taylor*, 306 Md. 290, 303 (1986). This supreme obligation may restrain the court's broad authority to exclude evidence as a discovery sanction.

**Family Law > Child Custody > Discovery Violations > Sanctions**

We hold that the circuit court erred in prohibiting Mother from presenting any testimony or evidence, aside from the limited information Mother provided in response to Father's discovery requests, without considering the impact that the sanction would have on the best interests of the children. We do not disturb the court's conclusion that Mother's responses were deficient and sanctionable, but the court's discovery sanction effectively precluded the court from considering potentially significant evidence directly relevant to the *Sanders-Taylor* factors in its determination of what custody arrangement would be in the best interests of the children.

**Family Law > Child Custody > Discovery Violations > Sanctions**

A court commits legal error when it makes a decision that impacts a custody determination without first considering how that decision will affect the child's "indefeasible right" to have his or her best interests considered. *See Flynn v. May*, 157 Md. App. 389, 410 (2004). As a matter of first impression, we hold that it was error for the court to impose a discovery sanction that precluded the court from receiving evidence without first ascertaining whether the evidence was relevant [i.e. relevant to the *Sanders-Taylor* factors] in determining which custody arrangement was in the best interests of the children.

**Family Law > Child Custody > Discovery Violations > Sanctions**

The court's independent obligation to the child[ren] requires that, before ordering the exclusion of evidence as a sanction, the court should take a proffer or otherwise ascertain what the evidence is that will be excluded, and then assess whether that evidence could assist the court in applying the *Sanders-Taylor* factors in its determination of the best interests of the child[ren]. When the court completes this assessment, we review any discovery sanction it imposes thereafter for an abuse of discretion.

Circuit Court for Montgomery County
Case No. 93208-FL

_____

A.A.

v.

AB.D.

_____

Fader, C.J.,
Leahy,
Eyler, Deborah S.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Leahy, J.

_____

Filed: June 5, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

In this appeal from an order modifying child custody, we resolve that the best interests of the child standard is the leading consideration for the court in deciding whether to preclude a party from introducing evidence as a discovery sanction in a child custody case. Children have an indefeasible right to have their best interests fully considered. *See Flynn v. May*, 157 Md. App. 389, 410 (2004).

Appellant, A.A. ("Mother"), appeals from an order of the Circuit Court for Montgomery County granting the motion to modify child custody filed by appellee, Ab.D. ("Father"). Among other things, the court ordered joint legal and shared physical custody and gave Father tie-breaking authority. Mother, who is self-represented in this appeal, raises numerous issues from which we have distilled one that is dispositive: [1]

> Did the circuit court fail to consider the best interests of the children by precluding Mother from introducing relevant evidence in a custody proceeding as a discovery sanction for Mother's failure to adequately respond to Father's discovery requests?

We hold that the circuit court erred, under the circumstances of this case, by precluding Mother from presenting evidence as a discovery sanction without first considering whether that evidence was relevant to the court's determination of the best interests of the children. Accordingly, we vacate the circuit court's order and remand to the circuit court for further proceedings consistent with this opinion.

---

[1] The questions presented by Mother in her brief appear in Appendix A at the end of this opinion.

# BACKGROUND

Mother and Father are the parents of two children:  I.D., born in 2005, and A.D., born in 2009.[2]  Mother and Father lived together with I.D. and A.D. until 2010, when, according to Mother, she left the family home and established a separate residence for herself and the children.  Father, in turn, moved to Florida in 2011, where he lived for approximately five years before returning to Maryland in March of 2016 with his new wife.

## Mother's Custody Complaint

In 2011, Mother filed a "Complaint for Custody and Other Relief" in the Circuit Court for Montgomery County requesting, among other things, sole legal and physical custody of the children.  Mother alleged that "it is the best interest" of I.D. and A.D. "that [Mother] be granted residential and sole legal custody" and requested that any visitation granted Father be supervised.  Father was served with process by the sheriff but failed to file an answer to the complaint.  Mother filed a request for an order of default, which was granted with leave to present testimony in the circuit court in support of her complaint for sole legal and physical custody.  Father did not challenge the order of default.

Following a hearing, the circuit court awarded Mother sole legal and physical custody of I.D. and A.D on November 18, 2011.  The court further ordered that "any visitation by [Father] with the Minor Child[ren] shall be supervised by [Mother's] brother . . . and shall be established by prior agreement with [Mother] provided adequate notice is given to [Mother] for any such visitation request."

---

[2] The parties agree that they were "married religiously" but it appears from the pleadings filed that they disagree as to whether they were ever legally married.

**Father's Motion for Modification of Visitation**

On October 23, 2015, Father filed a "Motion for Modification of Visitation." Father alleged that Mother had "interfered with [Father's] visitation and communications" with I.D. and A.D. and "relegated [Father's] visitation rights to accommodate her whims." Father amended his motion for modification on June 2, 2016 to indicate that he had "relocated to Montgomery County, Maryland for the sole purpose of being closer to his children" and that Father lived "close enough to the minor children to allow for frequent, consistent, and unsupervised visits."

On June 7, 2016, the circuit court ordered a custody and visitation evaluation. The court-appointed custody evaluator appeared on August 26th and presented her findings and recommendations.

Following three days of hearings, the circuit court ruled that "it's in the child's best interest that primary physical custody and sole legal custody remain with the mother at this time, but that the father will have access that will be unsupervised." The circuit court declined to grant overnight access during the weekend, due to the Father's schedule, or during the school week, because "it would be disruptive to the school schedule."

The court memorialized its ruling, on October 19, 2016, in a written order granting Father's motion. The order established a visitation schedule. Mother was ordered to "keep [Father] informed of all matters regarding the minor children as it relates to issues of legal custody, including but not limited to: school, grades, health, hospitalizations, medical treatment, doctor's appointments, religious upbringing, etc." Both parents were to attend their children's therapy sessions and split the costs thereof.

**Father's Motion for Modification of Custody**

Less than two years later, on July 27, 2018, Father filed a "Motion for Modification of Custody" and alleged that, since the October 19, 2016 Order, "several changes have occurred which directly affect the minor children and their best interest." Specifically, Father stated that his work schedule changed from the weekends to a "'regular' work schedule [which] allow[ed] [Father] to have more time with the minor children." Father also claimed that Mother had denied him access to the children, unilaterally altered the court-ordered visitation schedule, and "essentially 'lord[ed]' her position as the primary custodian, over [Father] to better serve *her* whims, and not the best interest of the minor children." (Emphasis in original.) In his "Amended Motion for Modification of Custody" filed on August 30, 2018, Father further noted that Mother had elected to homeschool the children without consulting him and alleged that the academic calendar Mother developed reduced I.D. and A.D.'s vacation days, resulting in "a concomitant reduction in [his] access/visitation with the minor children."

In her answer to Father's amended motion, Mother denied having interfered with the visitation schedule and further asserted that the children's best interests would not be served if the parties shared custody because Father "has shown himself defiant of the orders of this [c]ourt with respect to child support and the children's schedule, and he has demonstrated no desire to work cooperatively[.]" The circuit court set a hearing on Father's motion to modify custody for March 18, 2019.

## The Discovery Dispute

In anticipation of the hearing on his amended motion for modification, on November 27, 2018, Father propounded interrogatories and a request for production of documents. Thereafter, new counsel for Mother entered her appearance, and Mother's prior counsel withdrew from the case.

Mother, though her new counsel, sent by electronic mail her responses to Father's interrogatories on January 3, 2019. Of the 23 interrogatories propounded to Mother, Mother's counsel objected and did not otherwise respond to eight, claiming that they were irrelevant and that "much of the information was provided in previous litigation[.]" Counsel objected to—and did not answer—most of the interrogatories concerning her finances. Mother's counsel further objected to Father's interrogatory no. 14, which sought conversations between the parties concerning the children because this "[c]ommunication . . . takes place primarily through email[,] and [Father] has access to these emails. Production of such emails would be duplicative and overly burdensome." Counsel also omitted the contact information of the individuals whom Mother identified as having knowledge of the facts underlying the case.

Mother's counsel did not respond to Father's request for production of documents until February 14, 2019—almost three months after they were served.[3] Of Father's 65 discovery requests, counsel objected to 50, claiming that 45 of them were "irrelevant

---

[3] Although Mother's response is dated February 14, 2019, it lacked a certificate of service. Mother did not file a notice of discovery with the court pursuant to Maryland Rule 2-401(d)(2).

document[s] . . . related to financials" and that the remaining five were either irrelevant or duplicitous.

On February 15, 2019, the day after receiving Mother's response, Father's counsel filed a "Motion to Compel and for Sanctions," alleging that Mother had not responded to his November 27, 2018 request for production of documents. In her answer to Father's motion, Mother's counsel claimed that she had timely responded to all of Father's discovery requests.

On March 13, 2019,[4] Father's counsel filed a "Second Motion to Compel," along with a "Motion to Shorten Time" to require Mother to respond by noon on March 14. In his second motion to compel, Father's counsel alleged that Mother's responses to his discovery requests were "highly deficient" and that her "failure to properly and fully respond" had prejudiced his ability to prepare for the hearing. In an order entered the following day, the court instructed Mother to file an answer to Father's motion by 3:30 p.m. on March 14.

Mother's counsel did not, however, respond until March 18—the first day of the hearing on Father's motion to modify custody. At the hearing, the circuit court received argument on Father's second motion to compel (he conceded that the first motion was moot). Father's counsel argued that the second motion was predicated on "a number of deficiencies with both the interrogatory responses and the document production," and expounded that, among other deficiencies, Mother "refused to produce a single financial

---

[4] The certificate of service indicates that the motion was "sent via facsimile and mailed" to Mother's counsel on March 12, 2019.

6

document," refused to produce "any emails based on the fact that it would be duplic[ative]," and "[i]n essence, . . . barely produced anything in this case." Counsel for Father moved in limine to exclude both the testimony of witnesses for whom Mother had failed to provide contact information and, with the exception of financial documents, any evidence Mother had declined to produce during discovery.[5]

In response, Mother's counsel advanced three points. First, that she had not received any document requests addressed to Mother.[6] Second, that, nevertheless, she had responded as required.[7] And, third, that Mother was not required to produce documents and information that was already in Father's possession. The following colloquy ensued:

> THE COURT: So is it your understanding of the general discovery requirements that if your client believes that the other side has information about the information they're seeking that your client's not obligated to answer the question?

---

[5] As to Mother's financial documents, Father requested that the court order Mother's counsel to "produce them this evening so that we can review them for tomorrow."

[6] The document requests were addressed to Mother, but due to a scrivener's error, the instructions in the first paragraph on page one of the requests were directed to another individual, unrelated to the dispute. The judge questioned how counsel could assert that the requests were not directed to Mother when "[t]here is no other plaintiff, and these can only be [served on] a party."

[7] Mother's counsel asserted that Mother's financial documentation was irrelevant because Father "won't be able to prove to the [c]ourt that there are any circumstances that would warrant a change in custody, either in physical or in legal." The court replied:

> Well, at this point, the motion to modify custody is not – it's not simply a motion to modify access. [Father] is seeking a change of legal custody and physical custody from sole to joint. I don't know what the evidence is going to be, but that's what they pled, so it's not just simply an access case. It's a custody case, so it's a modification of legal custody, it's a modification of physical custody.

MOTHER'S COUNSEL: It's my understanding that if it would cost less, if it would be less burdensome for the requesting party to get the documents and the information requested, then it would be improper to require the other party to incur the expense and the burden to secure those documents when they already have them.

THE COURT: Okay. So you don't think it's a requirement that if that's the case to make that objection and to seek protection from the court to prevent your client from having to produce documents? Or do you think it's just a unilateral decision, we think he had it, therefore, we're not going to turn it over?

MOTHER'S COUNSEL: I think that it is a good idea to seek protection from the court.

After the conclusion of the parties' arguments, the court granted Father's motion.

The court ruled:

[I]t is the obligation of parties to respond or, if they have a valid objection, to make the objection and to produce documents and to answer interrogatories. In this case, the responses that are the production of documents from [Mother] [are] woeful at best.

So, I'm going to grant [Father's] motion where documents were requested, and they were not turned over, then [Mother] is not going to be permitted to introduce documents at this point. Where witnesses and information of witnesses was requested, and it wasn't turned over, those people will not be permitted to testify.

### The Hearing on Father's Motion to Modify Custody

After resolving the motion to compel and request for sanctions, the circuit court proceeded with a two-day hearing on Father's motion to modify custody.

Following opening arguments, Father's counsel called Mother as the first witness. Mother testified that, although in her view the best interests of the children were served by letting them remain in her sole physical and legal custody under the current schedule, she was amenable to discussing changes to the schedule which would be "best for keeping [the

8

children's] consistency and a good schedule for them." Mother worried that I.D. and A.D.'s academic progress, social activities, community engagement, and family relations would suffer if Father were granted an overnight schedule during the week.

Father testified next and explained that his work schedule had changed from weekends to Monday through Friday between the hours of 7:00 a.m. and 3:00 p.m. He pointed out that, at the 2016 hearing to modify visitation arrangement, the circuit court noted that it would "probably grant some weekend overnight if that could be done except that, with the [F]ather's work schedule right now, I don't think that that is practical." Father added that he moved his residence in May of 2017 to be closer to I.D. and A.D.

Father also testified that Mother had not kept him properly informed of issues relating to the Mother's custody of I.D. and A.D. Specifically, Mother would schedule appointments and activities on Father's scheduled visitation, and otherwise enroll the children in activities, without first consulting him. Also, Father testified that Mother had unilaterally altered the children's school schedule and placed the children in homeschool, which Father argued reduced his allotted visitation with I.D. and A.D. According to Father, before Mother homeschooled the children, Mother had requested that Father be offered only limited access to information from the children's school and scheduled parent-teacher conferences without first consulting Father. In addition to limiting access from other sources, Father presented evidence that Mother had failed to respond to Father's information requests regarding the children's academic progress. While Father was reluctant for I.D. and A.D. to be homeschooled, he testified that he would drop the children off with Mother for instruction during his assigned days, if he were granted overnights on

9

a regular basis. Father maintained that he was willing to work with Mother for the benefit of their children.

Father also testified that Mother objected to Father's participation in certain activities with the children. For example, Mother objected when Father had taken the children to get haircuts because, as Father testified, Mother felt that it undermined her authority as the custodial parent. Mother also refused to allow the children to attend a PG-13 movie with Father, despite Father's understanding that the children had viewed similarly rated films previously. According to Father, Mother's failure to communicate resulted in less visitation than ordered.

Mother testified in her case, over Father's objection.[8] Mother's testimony was limited by the circuit court, however, to the subjects she addressed in her answers to Father's interrogatories. Accordingly, Mother was only permitted to testify concerning: her income (Interrogatory Nos. 3 and 4); her educational background (No. 13); the custody and/or visitation schedule that Mother believed to be in the best interests of the children (Nos. 15 and 16); whether Father was fit to have physical custody of the minor children (No. 19); the homeschooling program (No. 22); and Mother's involvement in that program (No. 23).

---

[8] Father objected to Mother's testimony because she had not identified herself as a person of knowledge in her interrogatory responses. Mother's counsel responded that Mother responded to the interrogatories and "identified herself solely[,]" and that it "would be a miscarriage of justice to issue an order without allowing the mother of the children at issue to testify as to important things relating to their education . . . and the potential schedule[.]"

10

Mother testified that she chose to place the children in homeschool because, among other reasons, I.D. and A.D. were having education difficulties and social anxiety. Mother also testified that she had financial constraints relating to paying for the children's private school tuition and other obligations. Mother attributed the children's educational difficulties, in part, to the visitation schedule. However, the circuit court sustained an objection when Mother's counsel attempted to elicit further detail concerning evidence of the children's educational difficulties as reflected in their report cards, because the report cards were not produced in discovery:

MOTHER'S COUNSEL: And after starting their visitation with their father?

MOTHER: [I.D.]'s grades progressively declined. By the time that he exited [private] School in the spring of 2018, he was getting Cs and Ds, and this is after direct intervention - -

FATHER'S COUNSEL: I'm going to object and move to strike, Your Honor. These should have been provided. We should have these documents.

THE COURT: I'll sustain the objection.

MOTHER'S COUNSEL: Your Honor, the plaintiff attested to this information in her interrogatory responses that before the children were visiting with [Father], they were doing fine, and then afterwards, they weren't.

FATHER'S COUNSEL: But now we're getting into actual grades, which is different. She's saying they were fine, that's fine. She can say they're fine, but now she wants to say what their grade point averages were.

THE COURT: Right. I'll sustain the objection.

Mother further testified that she attempted to communicate with Father concerning the children's activities, their appointments, and other aspects involving the children but that "in [her] experience, it hasn't really been productive." Mother continued, "it becomes

11

very burdensome to try to focus on my kids' education, caring for them as a mom, work and also being bombarded with questions that, again, is [sic] my understanding have already been addressed." Because of how difficult it was to communicate with Father, Mother testified that it would not be possible to share legal custody.

The court sustained objections relating to Father's contributions to the children's private school education, Mother's attempt to involve Father in the children's homeschooling program, and how sharing physical custody would affect the children's education. The objections were sustained because the topics were outside the scope of subjects on which Mother was permitted to testify under the court's discovery sanction.[9]

Following closing arguments, the court elected to take the matter under advisement, so that the court could "review all of the evidence, testimony and exhibits in relation to the closing arguments[.]"

Because Mother's counsel had failed to include the contact information for the people whom Mother identified in her interrogatories as having "knowledge regarding the facts and/or circumstances involved in this action[,]" Mother was not able to call any

---

[9] For example, the following exchange occurred in relation to Father's contributions to the children's private school education:

MOTHER'S COUNSEL: What efforts, if any, did [Father] make to help you with that financial issue [maintaining enrollment in private school]?

MOTHER: None.

FATHER'S COUNSEL: Objection. This goes outside the scope, Your Honor. This wasn't addressed in any of the answers.

THE COURT: All right, sustained.

witnesses.  Furthermore, Mother was limited to introducing into evidence only those documents that her counsel produced in response to the document requests.  Consequently, approximately 60 of Father's exhibits were introduced and admitted during the two-day evidentiary hearing, whereas Mother introduced two exhibits and had one admitted.  Finally, the custody evaluator from the prior hearing was not called as a witness, nor was a revised report requested or presented.

### The Court's Ruling

On August 12, 2019, the judge explained his findings and ruling in open court.  At the outset, the court ruled that there had been material changes in circumstances.  The court noted that Father's new employment permitted Father to have a "more traditional work schedule" and be available on weekends.  Father's change of residence "to be closer to [Mother] [was] also . . . a significant fact that would allow an access schedule to be facilitated between the parties."[10]

The court further determined that the best interests of the children would be served by changing the custodial arrangement.  The trial judge cited several reasons in support of

---

[10] On appeal, Mother does not challenge the court's ruling that material changes in circumstances had occurred following the prior court order in 2016.  In determining whether to change an existing custody order, the court engages in a two-step analysis. First, the court must ascertain whether there has been a "material" change in circumstance. *McMahon v. Piazze*, 162 Md. App. 588, 593-94 (2005) (citing *Wagner v. Wagner,* 109 Md. App. 1, 28, *cert. denied*, 343 Md. 334 (1996)).  "If a finding is made that there has been such a material change, the court then proceeds to consider the best interests of the child as if the proceeding were one for original custody." *Id.*  We note that when the "visitor" parent seeks to transfer custody of a child from the "custodial" parent, the moving party bears the burden of "establish[ing] that the modification is necessary to safeguard the welfare of the child." *Shunk v. Walker*, 87 Md. App. 389, 397-98 (1991).

his determination. First, he reasoned that under the prior arrangement, Mother had not kept Father apprised of the children's academic performance and had unilaterally scheduled doctors' appointments and teacher conferences "during the very few hours that [Father] had access to the children." Second, the court deemed Mother's decision to homeschool the children particularly significant to its finding. The trial judge noted that Mother had made that decision without advising Father or seeking his input beforehand. Finally, the court stressed that Mother had become overbearing and inflexible with respect to Father's activities with the children. In granting the parties joint legal and shared physical custody, and, in awarding Father tie-breaking authority, the court expounded:

> They both seem to be very interested in their children's lives. . . . [Both] parents seem to be very active in their children's lives and motivated to make decisions for the children.
>
> Given the history of [] this case, where I think [Mother] had not really done a very good job in keeping [Father] apprised of what's going on, I'm going to grant joint legal custody, and I'm going to grant, in the event that the parents are unable to reach a mutual decision, I'm going to grant [Father] the tie-breaker decision authority in this case.
>
> I believe there has to be tie-breaking authority assigned to one or the other, and I believe if I granted that tie-breaker to [Mother], that things would not change as they are right now. That she would just simply continue to make decisions on her own.
>
> So, my hope is that [Father] has learned from this experience, and . . . that the two will consult with one another, and make joint decisions as parents should do, and that [Father] w[ill] exercise tie-breaker authority with reasonable restraint when the time is required for that.
>
> Regarding the physical custody of the children, given now the age of the children and the proximity of where the parents now live to one another, and there was testimony . . . that the boys wanted to spend more time with each of the parents[,] I'm going to make this a shared physical custody

situation where the parents are going to share the custody of the boys 50-50[.]

The court then proceeded to establish a shared custody schedule. The court memorialized its ruling in a written order entered August 15, 2019. Mother noted a timely appeal.

## 2016 Custody and Visitation Evaluation[11]

The court-appointed custody evaluator, Ms. Jennifer Schwartz, testified on August 26, 2016 during the prior hearing on Father's prior motion for modification and presented her oral report on the record.[12] Ms. Schwartz first explained the scope of her evaluation. She interviewed the parents and children individually and observed the parents with the children and members of their households. Ms. Schwartz also reviewed correspondence

---

[11] Although the custody evaluator's report was not introduced into evidence in the underlying 2019 custody hearing, the transcript of her testimony was included in the record and the Supplemental Record Extract. *See Kennedy v. Kennedy*, 55 Md. App. 299, 310 (1983) ("[T]he equity courts in Maryland have plenary authority to determine any question concerning the welfare of children within their jurisdiction, and such power does not terminate once the initial custody, support and visitation rights have been established. Rather, the courts are required to monitor the welfare of children in their jurisdiction and promote the children's best interests." (citations omitted)). We refer to the custody evaluator's testimony from the prior hearing not to suggest that the circuit court should have reviewed it before the 2019 custody hearing, but because it reveals some of the relevant background evidence that was missing from the 2019 custody hearing.

[12] Maryland Rule 9-205.3 sets out comprehensive prerequisites for "Custody and Visitation-Related Assessments," including requirements for the selection and qualifications of a custody evaluator. The rule was first adopted by the Rules Committee in 2015 following the Court of Appeals's decision in *Sumpter v. Sumpter*, in which the Court suggested that the Committee address issues surrounding access, confidentiality, and admissibility of custody evaluation reports. 436 Md. 74, 92, n.19 (2013); *id.* at 96 (Watts, J. concurring).

provided by the parties and school reports regarding the children and performed a case search on the parties and Father's wife.

Ms. Schwartz described a turbulent relationship between Mother and Father. Mother provided Ms. Schwartz with pictures of the alleged destruction of property that took place when there were arguments between Mother and Father.[13] Mother described filing for a protective order against Father, to which he consented, after he allegedly threatened Mother when she left the home in 2010.

Ms. Schwartz reported that Father described three domestic violence incidents during his relationship with Mother. On one occasion, Father stated that Mother had "slapped him[,] and [Father] got in her face and said, quote, don't you ever [expletive] do that again." On another occasion, Mother found a pornographic video and started pushing Father. He told Ms. Schwartz that Mother would not be intimate with him, so he had to purchase a pornographic CD. On the third occasion, Father "reported [Mother] pulled a knife on him but dropped the knife when he smacked it away." Father denied threatening to harm Mother or the children.

Father reported attending therapy because Mother accused him of anger issues. Mother related that Father's "moods were erratic, and she always was on the . . . edge of her seat not knowing what would happen." According to Mother, Father "was supposed to attend counseling to work on his anger issues but never did." Mother conveyed to Ms.

---

[13] Mother told Ms. Schwartz that she and Father were married during a religious exchange of vows, but Father never abided by the contract and never gave her a dowry.

Schwartz that Mother "left the home with [I.D.] on more than one occasion due to the abuse. They would reconcile after [Father] promised to attend therapy."

Ms. Schwartz related Mother's description of events concerning Father's relationship with the children. Mother stated that, when I.D. was three, Father "left the child home alone when he was supposed to be caring for the child." When she was pregnant with A.D., "[Father] threw her against the wall and choked her. [Mother] was on bed rest for five months during the pregnancy and he refused to care for [I.D.] despite her health issues." Also, Mother described events in 2009 before she left the family home:

> In the winter of 2009, [Father's] sister called [Mother] to inform her that [Father] had beaten [I.D.] for not saying hello. When the child returned home[,] he had red marks on his back. On one occasion [,] [Father] shoved a baby's wipe into [I.D.'s] mouth out of frustration. She left the home for the last time in 2009 when she saw [Father] place a pillow on [I.D.'s] face. He claimed that he was just playing with [I.D.] but [Mother] thought otherwise.

Father countered that Mother "lied and filed for a protective order against him saying that he was an abusive husband and father."

Mother told Ms. Schwartz that Father "moved to Florida without informing [Mother] and she found out through the child support office." Father "only saw the children once a year until March 2016 when he moved to Rockville from Florida." Mother complained that, since returning from Florida, Father had not completed family therapy or anger management classes, despite his agreement to do so during mediation. Mother accused Father of being neglectful and abusive to the children, forcing them to wear clothing that did not fit and feeding them foods that went against their religious beliefs, and to which A.D. was allergic.

17

Father told Ms. Schwartz that while he was living in Florida, he was unable to afford tickets to visit the children because Mother waited so long to respond to his requests for visitation. Since returning from Florida, he has "made accommodations for the children," including ensuring that the children were being provided with gluten free and other types of certified foods at Mother's request. He claimed that Mother had made it difficult for him to rebuild his relationship with the children.

Ms. Schwartz testified that she had no concerns about the homes or the parents' interactions with the children during observations in Mother and Father's respective homes. Likewise, Ms. Schwartz reported that Father's therapist did not have concerns about his anger management but diagnosed Father with adjustment disorder. Mother's therapist diagnosed Mother with adjustment disorder with anxiety and stated that Mother "is anxious about her children during visits with their father and is concerned about their safety and well-being as he was abusive in the past per her report."

Ms. Schwartz also interviewed other individuals. One of Mother and Father's friends from high school reported that Mother was "an amazing mother" but that [Father] "has anger issues and does not seem to understand his children and what their needs are." While this friend from high school "sees [Mother] with the children every couple of weeks because her brother [was] his roommate," he used to be "best friends with [Father] but stopped being friends with him after [Father] left Maryland and stopped seeing the children." Another family friend of Mother reported that, while the "children act excited to spend some time with [Father]," he has anger issues. Father's sister had no concerns about Father or Mother's interactions with the children.

18

Ms. Schwartz noted that she had "read the various e-mails that the parties provided and [did] not think that [Mother's] responses to [Father] were inappropriate." She observed that "[Mother] was often friendly and accommodating while [Father] was rude, negative or accusatory towards her."

Ms. Schwartz also explained that "[Father] does not seem to understand that it takes time to build relationships with children when one has not seen them for long periods of time":

> For example, he recently brought the children to get haircuts without [Mother]'s permission and against the children's wishes. He told me that he thought the children needed haircuts, that he was the parent and that he did not consult with [Mother] first. While [Father] is the children's parent, he completely disregarded the children's say in the matter. His expectation that he can automatically assert his authority towards the children and make decisions for them without their mother's permission is an example of his lack of understanding about relationship building, forming attachments and trust.

Following her findings, Ms. Schwartz provided her recommendations. She did not find Mother's "concerns about the children's safety at this time . . . as valid." Ms. Schwartz recommended that Father be granted unsupervised visits twice a week but did not recommend overnight visits with Father during the school year because "that would be disruptive to their schooling." However, "overnights during the summer should be considered."

## DISCUSSION

## I.

## Motion to Strike

Before turning to the merits, we address Mother's motion to strike Father's appellee brief, which Mother raised in her reply.

Father timely filed his brief with the clerk of this Court on February 20, 2020, in conformance with this Court's January 24, 2020 Order. Father's certificate of service, however, indicated that "two (2) true and correct copies of the foregoing [Brief of the Appellee] and the Appendix was mailed, postage prepaid to [Mother] . . . on this **20th day of December, 2017**." (Emphasis added.) Mother alleges that Father failed to serve his appellee brief "with a valid certificate of service" and that the clerk should not have accepted Father's brief. Mother asserts that because there was no timely-filed Appellee brief, she was presented with no opportunity to respond. Consequently, Mother contends that Father "must be precluded from presenting any verbal or written argument for review or consideration in this appeal." Father's counsel filed an amended certificate of service on March 11, 2020, the day after Mother filed her reply brief, in which counsel certified that "two (2) true and correct copies of the Brief of the Appellee was [sic] mailed, postage prepaid to [Mother] . . . on the **19th day of February, 2020**." (Emphasis added.)

Maryland Rule 1-323 directs the court clerk not to accept "for filing any pleading or other paper requiring service, other than an original pleading, unless it is accompanied by an admission or waiver of service or a signed certificate showing the date and manner of making service." Md. Rule 1-323. The Rule further provides that "[a] certificate of

20

service is prima facie proof of service." *Id.* When receiving and filing papers, a clerk "'acts only as a ministerial officer of the Court.'" *Dir. of Fin. of Balt. City v. Harris*, 90 Md. App. 506, 513 (1992) (quoting *Corey v. Carback*, 201 Md. 389, 402 (1953)). "Except as otherwise expressly provided by law, [] the clerk has no discretion in the matter and no right to make a judicial determination of whether the paper complies with the Rules or ought to be filed." *Id.* Here, while the original certificate of service provided the wrong date, the certificate did meet the literal requirements of Rule 1-323 by providing the date and manner of service. Accordingly, the clerk had no discretion but to accept Father's appellee brief. Indeed, the clerk was required to "leave it to the court and the parties to determine the sanction for the defect or deficiency." *Lovero v. Da Silva*, 200 Md. App. 433, 443 (2011) (citation and internal quotation marks omitted).

We now consider what sanction, if any, should be imposed upon Father. In *State v. Andrews*, this Court determined that an error in the certificate of service in a notice of appeal did not warrant dismissal of the appeal pursuant to Maryland Rule 1-323. 227 Md. App. 350, 370 (2016). We explained that though an "omission in the certificate of service is a defect, . . . [w]here there is no evidence that [the opposing party] was prejudiced or that the course of the appeal was delayed by a defect, 'it is the practice of this Court to decide appeals on the merits rather than on technicalities.'" *Id.* (quoting *Bond v. Slavin*, 157 Md. App. 340, 352-53 (2004)).

Here, Father's counsel filed an amended certificate of service on the day after Mother pointed out this defect. Counsel certified in the amended certificate of service that he timely served Mother on February 19, 2020. Mother has not contested the amended

21

certificate of service, and we do not see how she was prejudiced by the typographical error in the original certificate of service. Accordingly, Mother's motion to strike is denied.

## II.

## Sanctions for Discovery Violations in a Child Custody Case

### A. Parties' Contentions

Mother contends that the court abused its discretion by sanctioning her for having failed to fulfill her discovery obligations. Relying on *Flynn v. May*, 157 Md. App. 389 (2004), she argues that those sanctions deprived the children of their right to have a custody determination made after a full evidentiary hearing to determine whether such a change would be in the children's best interest, and "resulted in a limited and biased presentation of the case."

Father counters that the court acted within its discretion in granting his motion. Specifically, Father avers that the "ruling is squarely within the discretion of the [c]ircuit [c]ourt and, given the breadth of the discovery violation, completely appropriate."

### B. Discovery Sanctions in Child Custody Cases

Normally, we evaluate a trial courts' discovery sanction in a civil case through a well-defined lens—abuse of discretion. *Rodriguez v. Clarke*, 400 Md. 39, 57 (2007); *see also Das v. Das,* 133 Md. App. 1, 15 (2000) ("Abuse of discretion occurs 'where no reasonable person would take the view adopted by the [trial] court,' or when the court acts 'without reference to any guiding rules or principles.'" (quoting *North v. North*, 102 Md. App. 1, 13–14 (1994))). However, before we look through that lens in a child custody case, we must be satisfied that the court has applied the best interests of the child standard in its

22

determination. When the custody of children is the question, "the best interest[s] of the children is the paramount fact. Rights of father and mother sink into insignificance before that." *Kartman v. Kartman*, 163 Md. 19, 22 (1932).

In a child custody case, the best interests of the child standard "is firmly entrenched in Maryland and is deemed to be of transcendent importance." *Ross v. Hoffman*, 280 Md. 172, 174-75 (1977). "We have frequently and repeatedly emphasized that in situations where it applies, it is the central consideration." *McDermott v. Dougherty*, 385 Md. 320, 354 (2005); *see also Taylor v. Taylor*, 306 Md. 290, 303 (1986) ("We emphasize that in any child custody case, the paramount concern is the best interest of the child."). More than forty years ago, the Court of Appeals cataloged the various ways that our courts have expressed this enduring principle:

> Characterized as 'of transcendent importance' in *Dietrich v. Anderson*, 185 Md. 103, 116 (1945), the decisiveness of the best interest standard is emphasized by the various other ways reference is made to it in our opinions. For example, it was characterized as the 'ultimate test' in *Fanning v. Warfield*, 252 Md. 18, 24 (1969); the 'determining factor' in *Heaver v. Bradley*, 244 Md. 233, 242 (1966); the 'paramount consideration' in *Glick v. Glick*, 232 Md. 244, 248 (1963); the 'sole question' in *Young v. Weaver*, 185 Md. 328, 331 (1945); the 'paramount question' in *Piotrowski v. State*, 179 Md. 377, 381 (1941).

*Ross*, 280 Md. at 175 n.1.

Unfortunately, as happens in child custody cases, one or more parties may fail to comply with their discovery obligations. Maryland Rule 2-433 provides "two separate mechanisms by which a court may levy sanctions against a recalcitrant party." *Warehime v. Dell*, 124 Md. App. 31, 54 (1998). First, a court may, on motion by a discovering party, impose immediate sanctions against the failing party if the court "finds a failure of

discovery." Md. Rule 2-433(a).[14] The court "may enter such orders in regard to the failure as are just," including: (1) an order designating facts as established for the purpose of the action; (2) "[a]n order refusing to allow the failing party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence"; or (3) "[a]n order striking out pleadings or parts thereof, or staying further proceeding until the discovery is provided, or dismissing the action or any part thereof[.]" Md. Rules 2-433(a).

Second, pursuant to Rule 2-433(c), the court may impose sanctions for a failure "to obey an order compelling discovery." *Warehime*, 124 Md. App. at 54 (discussing former version of Md. Rule 2-433(c)). When a party or witness responds to a discovery request, but the discovering party deems that response inadequate, Rule 2-432(b) permits the discovering party to move for an order to compel discovery. Md. Rule 2-432(b). If a person violates an order compelling discovery, the discovering party may pursue sanctions under Rule 2-433(c).[15]

---

[14] A "failure of discovery" occurs when a party, *inter alia*, "fails to serve a response to interrogatories under Rule 2-421 or to a request for production or inspection under Rule 2-422, after proper service." Md. Rule 2-432(a).

[15] Maryland Rule 2-433(c) provides, in relevant part:

(c) **For Failure to Comply With Order Compelling Discovery.** If a person fails to obey an order compelling discovery, the court, upon motion of a party and reasonable notice to other parties and all persons affected, may enter such orders in regard to the failure as are just, including one or more of the orders set forth in section (a) of this Rule. If justice cannot otherwise be achieved, the court may enter an order in compliance with Rule 15-206 treating the failure to obey the order as a contempt.

In addition to its authority under the Maryland Rules to impose sanctions, a trial court also has the power to impose sanctions as part of the court's inherent power to control and supervise discovery. *Gallagher Evelius & Jones, LLP v. Joppa Drive-Thru, Inc.*, 195 Md. App. 583, 596 (2010) ("Even if . . . the precise action taken by the circuit court is not specifically prescribed by a rule or statute, the court has the ability, in general, to definitively and effectively administer and control discovery, as the Maryland Rules contemplate." (citation, internal quotation marks, and brackets omitted)); *Klupt v. Krongard*, 126 Md. App. 179, 195-97 (1999) (concluding that our courts had authority to sanction discovery misconduct "whether that authority is derived from the discovery sanctions rule or from their inherent powers" (citation, internal quotation marks, and brackets omitted)).

It is axiomatic that when a party willfully withholds documents, prospective witnesses' contact information, and other information requested by a discovering party, the court *may* bar the withholding party from introducing such evidence at trial. *Bartholomee v. Casey*, 103 Md. App. 34, 48 (1994) ("A trial court clearly has the power to exclude evidence willfully withheld by one party in violation of properly filed discovery requests."). However, in a child custody case, the court has an absolute and overriding obligation to conduct a thorough examination of all possible factors that impact the best interests of the child, as articulated in *Montgomery Cty. Dep't of Soc. Servs. v. Sanders*, 38 Md. App. 406, 420 (1977),[16] and, with particular relevance to a consideration of joint

---

[16] In *Sanders*, this Court listed ten non-exclusive factors: (1) fitness of the parents;
(Continued)

25

custody, as articulated in *Taylor*, 306 Md. at 303.[17, 18] This supreme obligation may restrain the court's broad authority to exclude evidence as a discovery sanction. While this Court has had limited occasion to consider the application of discovery sanctions in child custody disputes, we have addressed this issue in the context of default judgments.[19]

---

(2) character and reputation of the parties; (3) desire of the natural parents and agreements between the parties; (4) potentiality of maintaining natural family relations; (5) preference of the child; (6) material opportunities affecting the future life of the child; (7) age, health, and sex of the child; (8) residences of parents and opportunity for visitation; (9) length of separation from the natural parents; and (10) prior voluntary abandonment or surrender. 38 Md. App. at 420.

[17] In *Taylor*, the Court of Appeals enumerated multiple factors, including some that overlap the *Sanders* factors: (1) capacity of the parents to communicate and to reach shared decisions affecting the child's welfare; (2) willingness of parents to share custody; (3) fitness of parents; (4) relationship established between the child and each parent; (5) preference of the child; (6) potential disruption of child's social and school life; (7) geographic proximity of parental homes; (8) demands of parental employment; (9) age and number of children; (10) sincerity of parents' request; (11) financial status of the parents; (12) impact on state or federal assistance; (13) benefit to parents; and (14) other factors. 306 Md. at 304-11.

[18] As Judge Adkins pointed out writing for the Court of Appeals in *Santo v. Santo*, "[a]lthough the majority of jurisdictions have statutory factors for courts to consider in custody cases, Maryland does not." 448 Md. 620, 627, n.2 (2016) (citations omitted).

[19] A leading family law treatise also comments on the application of a change of custody in the context of a default judgment:

> [I]t is permissible to change custody where an Order of Default is entered against the primary residential parent. However, the fact finder must take special precautions to ensure that appropriate procedural safeguards have been taken prior to modifying custody, and must have evidence sufficient to find that the modification is in the best interest of the child/children.

Cynthia Callahan & Thomas C. Ries, Fader's Maryland Family Law § 5-10(k) (6th ed. 2016).

26

In *Flynn v. May*, we held that the circuit court abused its discretion when it ordered a change in the primary custody of a child after a default judgment had been entered against the child's mother. 157 Md. App. 389, 411 (2004). In that case, a father filed an action for custody of the parties' son as well as child support. *Id.* at 392. The defendant mother, proceeding pro se, attempted to file an answer with the court but did not include a certificate of service. *Id.* Accordingly, her answer was never filed. *Id.* The court granted the plaintiff father's request for an order of default but directed that "testimony to support the allegations of the Complaint" still be taken. *Id.* at 392, 394-95. Thus, despite the default, the mother appeared at the custody hearing with five witnesses. *Id.* at 396. The judge, however, precluded the mother from testifying or offering evidence. *Id.* As a result, a seven-year-old boy, who lived his entire life with his mother, had his physical custody transferred to his father without a trial or evidentiary hearing. *Id.* at 397, 411.

Reiterating that a child has "an indefeasible right to have any custody determination concerning him made, after a full evidentiary hearing, in his best interest," we instructed that a child does not lose that right based on his or her parent's procedural pleading deficiency. *Id.* at 410. In reversing the decision of the circuit court, we reasoned that the court's entry of default judgment without considering any evidence was contrary to the very purpose of a custodial hearing, to wit, to provide for the best interests of the child. *Id.* at 407-10.

In *Wells v. Wells*, a husband filed a complaint for divorce based on the wife's adultery, which was adequately proven, and for custody of the couple's minor child. 168 Md. App. 382, 386 (2006). The wife both failed to answer the complaint or move to strike

27

an order of default after it was entered. *Id.* After a master's hearing, in which only the husband and his witnesses appeared and presented evidence, the husband was granted an absolute divorce; custody of the child, with visitation rights granted to his wife; use and possession of the family home; and child support. *Id.* at 387-88. Eight days later, the wife moved to vacate the order of default and for a new trial on the grounds of fraud and maintained that she never received notices from the court after the initial complaint. *Id.* at 389-90. Without holding a hearing, the court denied the wife's motions. *Id.* at 391.

We held that the circuit court abused its discretion in denying the wife's motion to vacate the default judgment as to all issues except to the divorce. *Id.* at 396. We explained, "*Flynn* teaches that [the child] had an indefeasible right to have his best interests considered in a full evidentiary hearing. As we have already observed, 'default judgment cannot substitute for a full evidentiary hearing when a court, in order to determine custody, must first determine the best interest of the child.'" *Id.* at 397 (quoting *Flynn*, 157 Md. App. at 407). *See also Rolley v. Sanford*, 126 Md. App. 124, 131 (1999) ("Where there exists a discovery violation in a child support matter, as always, the best interest of the child is paramount and a trial court must exhaust every available remedial step to enforce discovery before the extreme sanction of dismissal may be ordered. We shall not suffer the obdurate conduct of a recalcitrant parent, stepparent, or custodian to deprive children of their right to adequate support.").

The foregoing cases clarify that procedural defects should not be corrected in a manner that adversely impacts the court's determination regarding the child's best interests. *See Flynn*, 157 Md. App. at 410-11. It follows that the same principle applies to

28

discovery sanctions. In assessing the child's best interests, "'[a] trial court, acting under the State's *parens patriae* authority, is in the unique position to marshal the applicable facts, assess the situation, and determine the correct means of fulfilling a child's best interests.'" *Baldwin v. Baynard*, 215 Md. App. 82, 108 (2013) (quoting *In re Mark M.*, 365 Md. 687, 706 (2001)). Plainly, a child's best interests are best attained when the court's decision is as well-informed as possible.

Returning to I.D. and A.D., we hold that the circuit court erred in prohibiting Mother from presenting any testimony or evidence, aside from the limited information Mother provided in response to Father's discovery requests, without considering the impact that the sanction would have on the best interests of the children. We do not disturb the court's conclusion that Mother's responses were deficient and sanctionable, but the court's discovery sanction effectively precluded the court from considering potentially significant evidence directly relevant to the *Sanders-Taylor* factors in its determination of what custody arrangement would be in the best interests of the children.

By foreclosing Mother's opportunity to introduce evidence of Father's past conduct, the court was unable to assess completely Father's fitness to have custody of I.D. and A.D.—let alone tie-breaking authority. *See Hild v. Hild*, 221 Md. 349, 357 (1960) ("It stands to reason that the fitness of a person to have custody is of vital importance."). The Court of Appeals has underscored that "in evaluating parental communication" in order to determine tie-breaking authority, "'the best evidence' a court should look for is the 'past conduct or [a] track record of the parties.'" *Santo v. Santo*, 448 Md. 620, 628 (2016) (quoting *Taylor*, 306 Md. at 307). And, because Mother was precluded from providing

specific evidence of the children's declining academic performance following Father's more recent visitation rights, the court could not fully assess the potential disruption to I.D. and A.D.'s school life in awarding joint custody and fashioning a custody schedule.

In contrast to the turbulent relationships described by the court evaluator during the hearing in 2016, including references to a protective order against Father, domestic violence incidents, and potential episodes of abuse; the evidence presented at the underlying evidentiary hearing was focused on Mother's failure to keep Father informed of issues relating to I.D. and A.D. Because the court did not explore what evidence Mother intended to offer, the court could not have known the significance of the proscribed evidence and its potential impact on its ability to determine the best interests of the children.

In sum, our decisional law has long recognized that a court commits legal error when it makes a decision that impacts a custody determination without first considering how that decision will affect the child's "indefeasible right" to have his or her best interests considered. *See Flynn*, 157 Md. App. at 410. As a matter of first impression, we hold that it was error for the court to impose a discovery sanction that precluded the court from receiving evidence without first ascertaining whether the evidence was relevant [i.e. relevant to the *Sanders-Taylor* factors] in determining which custody arrangement was in the best interests of the children. We do not condone the behavior of discovery violators and do not intend that protecting minor children have the collateral effect of giving discovery offenders a pass. We encourage trial courts to be creative in finding sanctions other than precluding evidence, but recognize that, even where a court exhausts other remedial steps to enforce discovery, sometimes the failure by obstinate parties and their

counsel to follow the rules make more extreme sanctions necessary. When this occurs in a child custody case, the court's independent obligation to the child[ren] requires that, before ordering the exclusion of evidence as a sanction, the court should take a proffer or otherwise ascertain what the evidence is that will be excluded, and then assess whether that evidence could assist the court in applying the *Sanders-Taylor* factors in its determination of the best interests of the child[ren]. When the court completes this assessment, we review any discovery sanction it imposes thereafter for an abuse of discretion. In the case before us now, we do not reach the question of whether the court abused its discretion in ordering the exclusion of evidence as a discovery sanction because it failed to apply the best interests of the child standard.

Accordingly, we vacate the judgment and remand the case to the circuit court to reassess the best interests of the children after a full presentation of evidence that the court finds relevant to that determination. On remand, the circuit court may impose sanctions on Mother for her discovery abuses in a manner that does not impact the court's analysis of the children's best interests, and may, of course, order a further custody evaluation to assist with its determination.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY VACATED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**

31

# APPENDIX A

1) Was the trial judge's decision to award the noncustodial parent with tie-breaker authority for legal custody appropriate based on the best interests of the child?

3) [sic] Did the lower court serve the best interests of the children and commit reversible error when it denied allowance of appellants' full testimony, Interrogatory Responses, Production of Documents, and witness testimony?

4) Did the lower court serve the best interest of the children and commit reversible error [] when it proceeded with the two-day hearing on minimal evidence instead of allowing an overnight exchange of evidence?

6) [sic] Did the lower court serve the best interest of the children and commit reversible error by denying the minor children an updated Custody Evaluation or Child Best Interest Attorney or Advocate in a high conflict case?

7) Was the trial court's decision to sanction [Mother] and also limit evidence from the trial non-prejudicial or harmless?

8) Were the best interests of the children served by the trial court's decision to limit [Mother's] time to present her case?

9) Did the trial court err in overruling [Mother's] exceptions to the judge's recommendations regarding religious holidays?